No. 5380.

M. C. Funderburg *v.* The State.

Adultery—Evidence—Charge of the Court.—In the trial of appellant for adultery with one J., in Bosque county, the State was permitted over objection by the defense, to prove certain acts and conduct of J. and appellant in other counties and since the presentment of the indictment; and the trial court, with reference to this evidence, refused to instruct the jury as to the special purpose for which it was competent, and to guard the jury against convicting the accused of adultery in Bosque county by considering such evidence as independent proof thereof. Bills of exception were reserved by the defense to the admission of the proof and to the rejection of the requested instructions. *Held*, that there was no error in admitting the evidence, in view of the other proof in the case, but it was error to omit and refuse to limit it to its proper purpose, and properly to guard the jury against misapplying it to the prejudice of the accused.

Appeal from the County Court of Bosque. Tried below before the Hon. A. R. Barry, County Judge.

Martha C. Funderberg, the appellant, was indicted for adultery with one James Jackson. The venue of the offense was laid in the county of Bosque, and the time as July 1, 1885. The trial was had at the March term, 1887, of the county court, and resulted in appellant's conviction, with a fine of one hundred dollars assessed as her punishment.

Mrs. S. J. Jackson, the first and most material of the witnesses for the State, was the wife of James Jackson, the alleged paramour of the appellant. She testified that she and said Jackson were married eighteen years previous, and moved to Clifton, in Bosque county, in the autumn of 1884. About July 1, 1885, her husband left her there. During part of the time they lived there

they did not live together as husband and wife should, and they occupied different beds. They did not get along together well after the arrival at their house of the defendant, who was the sister of the witness and the cause of the trouble between witness and her husband. When defendant arrived, the witness did not speak to her, and was not on speaking terms with her during her stay. The house had two rooms, one of which was occupied by defendant and the other by witness and her family. Defendant ate with the family for about a month after she came, and after that she cooked, ate and slept in her own room. Witness, after her husband and the family had gone to bed in her room, had seen him get up and go into defendant's room. She had seen him do that at least three or four times, and, on one of those occasions, about ten or eleven o'clock at night, she followed him into the defendant's room and found him and the defendant *in flagrante delicto* in the latter's bed. "I said a good deal; I was mad; my feelings were hurt. He said to me, 'Well, G—d d—n you, prove it.' I left him in there; that was some three or four weeks before she left." Defendant and Jackson always went out together to work. Witness could not help herself. The first time she saw anything wrong between her husband and defendant was about four years ago, while they lived at Belton. Having been out on that occasion, witness came in and found the defendant, who was then about seventeen years old, sitting in Jackson's lap. Witness raised a storm about that, and the defendant, about three weeks afterwards, went to her mother's, at Brazos Point, Bosque county, and never came to live with witness's family until about December, 1884, at Clifton, and then came against the consent of witness. Defendant left Clifton three or four weeks before Jackson left witness. Defendant has been mostly raised "by us."

Cross examined, the witness thought it was about the middle of May, 1885, when she saw her husband and defendant copulating in the latter's bed. The moon was shining brightly through a window, and she saw them plainly. George Jackson, the eldest of witness's six children, was not at home that night, and the other children were asleep and were not awakened. The beds occupied by witness and the defendant were separated by a plank partition wall. A door opened from witness's room into defendant's, and Jackson, when he went into defendant's room the night in question, left the door open as he found it. From

Clifton, the defendant left, in March, 1885, to go to Mr. Brock's, at Kopperl, in Bosque county.

Ville Jackson, a daughter of the preceding witness, testified, for the State, that she and her mother habitually slept in the same bed, and that her father occupied a pallet in the same room "when he was not in the other room with the defendant. I have seen father kiss the defendant a great many times. They were together the most of the time. I have seen father go into the defendant's room several times at night after we had all gone to bed. When I saw the kissing, I was in the room with them."

Meek Mooney, for the State, testified that in the spring of 1885 James Jackson and the defendant hoed cotton for him. Witness always saw them together, and observed that they were very affectionate. Occasionally some of Jackson's children were with them.

Ross Blythe, a State's witness, knew Jackson and the defendant, and in the fall of 1885 saw them on the railroad extension west of Lampasas. They were living in the same tent, and defendant was cooking and keeping tent for Jackson.

The defense introduced James Jackson and his son George. The latter testified that he was living with his father, and had been ever since the summer of 1885. While the defendant lived with the Jackson family she was treated as a member of it. Part of the time they all slept in the same room and ate at the same table. Witness was away from home a portion of the time. He never saw anything wrong between his father and the defendant. His father always treated defendant as one of the family. In the fall of 1885 the witness and his father worked on the railroad in Brown county, and the defendant cooked for them. They lived in a tent containing two beds, of which one was occupied by the defendant and the other by witness and his father.

James Jackson, for the defense, testified that the defendant had lived with him, as one of his family, most of the time since she was four years old. Witness had always treated her as one of his children. He had often kissed her while she was small, but never since she was grown. She lived a few months with him and his family at Clifton, and from there went to live with Mr. Brock at Kopperl. After describing his house at Clifton as his wife had done, he stated that in the room occupied by defendant there was a chimney, and sometimes he fished and seined in the

night, and would come home with his clothes wet, and would go into defendant's room and hang his wet clothes to the fire. Witness positively denied that he ever had any unlawful conduct or relationship with the defendant. He left Clifton July 1, 1885, and went to Belton and worked in a rock quarry. The defendant came there and boarded with the family witness was boarding with. From there they went to Brown county, he to work on the railroad, and she to keep camp for him and his son George. Defendant was with witness at Dallas when he, the witness, was arrested on the charge of adultery with her. Witness's son George was also with witness at Dallas when he was arrested on said charge, Defendant had been with witness ever since about August, 1885, when she came to him at Brownwood.

*Lockett & Lockett,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. The appellant was convicted under an indictment charging her with adultery with one James Jackson. Upon the trial the State was permitted to prove, over objection, acts occurring beyond the limits of Bosque county, and subsequent to the filing of the indictment. Under the peculiar facts of this case, we are of opinion that there was no error in this.

Bearing directly upon these acts and conduct of appellant and Jackson, the court was requested to instruct the jury that "the venue in this case is laid in Bosque county, and you will not consider the evidence before you of acts in other counties for the purpose of determining the defendant's guilt in Bosque county."

While this charge is not strictly correct, it clearly called to the attention of the court the proper rule of law applicable to that portion of the evidence. In corroboration of the witnesses for the State, these subsequent acts, though occurring in other counties, may be considered. But certainly appellant should not be convicted in Bosque county for adulterous acts committed in another county; and the jury should have been so instructed.

We are therefore of opinion that the court should have framed and given an appropriate charge, its attention having been pertinently called to the question, by the special instruction asked.

*Reversed and remanded.*